IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

SEPTEMBER 1995 SESSION

FILED

November 5, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9503-CR-00086 |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable John P. Colton, Jr., Judge |
| | ) | |
| KENNETH B. SCHALLER, | ) | (Aggravated Sexual Battery -- 2 counts) |
| | ) | |
| Appellant. | ) | |


For the Appellant:

David K. Lower
4384 Stage Road, Suite 209
Memphis, TN 38128
(AT TRIAL)

James V. Ball
217 Exchange Avenue
Memphis, TN 38105
(ON APPEAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Ellen H. Pollack
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0485

John W. Pierotti
District Attorney General
        and
Jennifer S. Nichols
Assistant District Attorney General
201 Poplar Avenue, Suite 301
Memphis, TN 38103-1947


OPINION FILED:_____


JUDGMENT IN CASE NO. 9209723 VACATED;
CONVICTION IN CASE NO. 9209722 REVERSED; REMANDED


Joseph M. Tipton
Judge


**O P I N I O N**

The defendant, Kenneth B. Schaller, appeals as of right from his convictions by a jury in the Shelby County Criminal Court on two counts of aggravated sexual battery, a Class B felony. The defendant was sentenced as a Range I, standard offender to ten years for each count, to be served concurrently in the custody of the Department of Correction. The defendant contends (1) that the evidence was insufficient to support a conviction of aggravated sexual battery of the victim alleged to be mentally defective, (2) that the two offenses should have been severed and tried separately, and (3) that the trial court erred in allowing into evidence the prior written statements of the victims.

We hold that the indictment regarding the allegedly mentally defective victim fails to state the offense of aggravated sexual battery for which the defendant was convicted and that the evidence was insufficient to convict the defendant for sexual battery in that case. We also hold that although the offenses were properly consolidated for trial, the use of inadmissible out-of-court statements made by one victim improperly prejudiced the defendant relative to the offense involving the second victim.

This case involves the defendant's conduct toward his girlfriend's two daughters, S.T., age seven at the time of the alleged offense, and C.S., age thirteen at the time of the alleged offense. The defendant was living in the same household as his girlfriend and the victims. The defendant was indicted on a count of aggravated sexual battery against S.T., a person less than thirteen years of age. The defendant was also indicted on a purported count of aggravated sexual battery against C.S., a person that the defendant knew or had reason to know was mentally defective. The indictments charged that the offenses occurred between the dates of March 1, 1992, and August 25, 1992.

The state's first witness, Christine Smith, testified that she rented one of her houses to the defendant on July 10, 1992. She testified that the defendant, his girlfriend Kimberly Schauer, her three children, and the child of the defendant and Ms. Schauer were to be living in the house. Ms. Schauer's children included the two victims, C.S. and S.T., and her four-year-old son, B.T. The defendant's and Ms. Schauer's child was an eighteen-month-old infant.

Tom Beard, a detective with the Collierville Police Department, testified that he investigated the allegations of child abuse. He testified that on August 25, 1992, he met with Dean Grisby, a counselor for the Department of Human Services, at the Collierville Middle School, and after meeting with a school official, he and Mrs. Grisby interviewed C.S.

Detective Beard testified to the details of his interview with C.S. He testified that C.S. had just turned thirteen years old and that she appeared to be "mentally challenged," even though she appeared to understand the questions being asked and responded appropriately. The state then questioned the detective as to the details of the interview, which he answered by reading from the transcript. He testified that C.S. described how the defendant touched her and her sister, S.T., and that C.S. said that she told her grandmother, Peggy Lewis, about the abuse. The detective testified by reading to the court a significant portion of the thirty-five-page interview transcript.

Detective Beard testified that after the interview was over, he and Mrs. Grisby decided that they needed to get a protective custody order for the three children, C.S., S.T., and B.T. He said that they went to the elementary school and picked up the other two children, S.T. and B.T., took them to police headquarters, and then contacted their mother, Kim Schauer, and their grandmother, Peggy Lewis.

Detective Beard testified that he and Mrs. Grisby interviewed S.T. at police headquarters. Detective Beard testified to the details of his interview with S.T. by reading from portions of the eighteen-page transcript of the interview he had with S.T. The detective stated that S.T. said that the defendant grabbed her hand and made her rub his penis. He also stated that S.T. said that both her sister, C.S., and brother, B.T., were in the room at the time.

S.T., the seven-year-old victim who was nine years old at the time of the trial, testified that the defendant took her hand and placed it on his penis, which he had covered with a pillow that was on his lap. She said that she was finally able to yank her hand away. S.T. also testified that she told her grandmother, Peggy Lewis, what the defendant had done.

B.T., the victims' younger brother who was six years old at the time of the trial, testified that he heard the defendant tell the victims to touch his "privacy." He stated that he did not see anything except his two sisters sitting on the couch with the defendant.

C.S., the thirteen-year-old victim who was fourteen at the time of the trial, testified that while sitting on the couch with the defendant, the defendant whispered in her ear asking her to touch his penis. Both S.T. and B.T. were in the room at the time. She testified that, against her will, the defendant took her hand and placed it on his penis. She also testified that on another date he fondled her vagina while she was sitting on the couch at their home in Collierville. She said that when she told him to stop, he did stop.

C.S. testified that she told her mother, Kimberly Schauer, what the defendant had done but her mother did not believe her. C.S. testified that she then told a counselor at school, which led to the police investigation resulting in the instant charges. On cross-examination, C.S. could not provide any details, even as to what

4

she testified to on direct, and frequently replied, "I don't get it" or "I don't know." She did admit to hating the defendant and wanting to have nothing to do with him.

Patricia Davidson, the therapeutic foster care program counselor for C.S., testified to her familiarity with C.S. Ms. Davidson testified that she believed that C.S. was under special therapeutic foster care because C.S. was sexually abused and mentally challenged. She testified that C.S. was seeing a psychiatrist every other week, and that C.S. was enrolled in a special education program.

Dr. Margaret Aiken, a forensic expert in nursing who had examined the victims, testified that the examination of C.S. did not show any signs of abuse. She testified that she could not examine the vagina because the opening remained closed, not an unusual condition for a child. Dr. Aiken testified that her examination occurred more than a week after the alleged abuse and that would be sufficient time for any damage to heal, leaving no visible signs of abuse. On cross-examination, Dr. Aiken testified that the examination did not show any abnormal conditions or signs of abuse.

Dr. Aiken then testified that the examination of S.T. showed a healed tear of her hymen. She testified that the cause of the healed tear would most likely be from a penetrating injury, some insertion into the vagina. On cross-examination, Dr. Aiken testified that she could not tell how long before her examination that the injury causing the tear occurred. The defendant pointed out that S.T. had not alleged any penetration of the vagina and Dr. Aiken responded that an objective exam required that she look at everything.

Kimberly Schauer, the mother of the victims and the girlfriend of the defendant, testified that her mother-in-law, Peggy Lewis, told her that the children were making accusations. Ms. Schauer said that she did not believe her children. On redirect, Ms. Schauer testified that she did not believe her daughters because of their previous false accusations. C.S. had accused a boy of putting his hands between her

5

legs while on a school bus. Ms. Schauer said that C.S. would not give her the boy's name and telephone number. Ms. Schauer testified that S.T. had accused the defendant of striking her, but upon investigation by Social Services, the injury was found to have been caused by the other children while the family had been camping.

The defendant's mother, Barbara Ishee, testified as to the reputation for truthfulness of the victims, stating that the two victims and their brother, B.T., were not truthful. Donna Lewis, the defendant's sister-in-law, testified as to the reputation for truthfulness of the victims, stating that, in her opinion, the two victims and their brother, B.T., were not truthful. The defendant testified that the victims were falsely accusing him because they hated him and wanted to live with their father. Peggy Lewis, the defendant's step-mother, testified to the children's reputation for lack of truthfulness, and she also gave her opinion that they were not truthful.

The defendant was convicted upon the foregoing proof of aggravated sexual battery of S.T., a victim under thirteen years of age, and of aggravated sexual battery of C.S., a mentally defective victim.

## I. INDICTMENT SUFFICIENCY

Although not raised by the defendant, we conclude that the indictment relative to C.S., the allegedly mentally defective victim, fails to charge the defendant with aggravated sexual battery. In material part, the indictment alleges that the defendant "did unlawfully engage in sexual contact with [C.S.], a person the defendant knows or had reason to know to be mentally defective, in violation of T.C.A. § 39-13-504 . . . ."

At the time of the alleged conduct, aggravated sexual battery was defined as an "unlawful sexual contact with a victim by the defendant or the defendant by a

6

victim accompanied by any of the circumstances listed in § 39-13-502(a)."  T.C.A. § 39-13-504(a) (1991).  The circumstances included:

> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
>
> (2) The defendant causes bodily injury to the victim;
>
> (3) <u>The defendant is aided or abetted by one (1) or more other persons; and</u>
>> (A) Force or coercion is used to accomplish the act; or
>> (B) <u>The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless</u>; or
>
> (4) The victim is less than thirteen (13) years of age.

T.C.A. § 39-13-502(a) (1991) (emphasis added).  Noticeably absent from the indictment is the charge that the defendant was aided or abetted by another person.  Without this element, the indictment does not charge aggravated sexual battery.


Rather, the indictment charges sexual battery, a Class E felony, under T.C.A. §§ 39-13-505 (1991) and 39-13-503(a)(2) (1991), which prohibit unlawful sexual contact with a person that the defendant knew or had reason to know was mentally defective.  Also, we note that the trial court's instructions to the jury were limited to the elements of sexual battery, as well.  Thus, the jury's findings involving C.S. as the victim coincided with the offense actually charged and the instructions given.  This means that we may still consider the defendant to have been convicted of sexual battery in our review of the issues in this case.


## II. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to convict him relative to the thirteen-year-old victim, C.S., because the state failed to prove either that the victim was mentally defective or that he knew or should have known that she was mentally defective.  The state responds that the evidence was sufficient, pointing to Detective Beard's testimony that C.S. "appeared to be mentally challenged," to Patricia Davidson's reference to C.S. being "mentally challenged," and to the victim's conduct

7

as she was testifying.  Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  This means that the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it.  <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

For the defendant to be guilty under the allegations of the indictment involving C.S., the victim had to have been mentally defective and the defendant had to have known or have had reason to know that she was mentally defective.  Pursuant to T.C.A. § 39-13-501(3), mentally defective "means that a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of appraising the nature of [her] conduct."

Detective Beard testified that C.S. "appeared to be mentally challenged" when he interviewed her.  Ms. Davidson testified that she is employed in a therapeutic foster care program in which parents receive training to deal with children who have "special emotional needs."  She said that she is the family counselor for C.S. and that C.S. was in a special education school and receiving psychiatric counseling.  When asked if C.S. was in the program because of the abuse or because she is "mentally challenged," Ms. Davidson replied that it was both.  She said that C.S. would be returned to a regular school, but would still attend special education classes.  Ms. Davidson did not give any personal opinion of the victim's mental status nor did she give any specific detail of how C.S. was "challenged."

We conclude that under the foregoing testimony, taken as true, no rational juror could find beyond a reasonable doubt that C.S. suffered from a mental disease or defect that rendered her incapable of appraising the nature of her conduct.  We view the testimony that C.S. was "mentally challenged" to be an ambiguous, euphemistic

8

reference that is not helpful in attempting to discern whether C.S. met the definition of mentally defective under under T.C.A. § 39-13-501(3). Neither an emotional problem, psychiatric counseling, nor admission to special education programs equates with being mentally defective.

Similarly, we see nothing in the record regarding her testimony or conduct that shows C.S. to be mentally defective. She was found competent to be a witness. She described her attempts to get the defendant to stop, which, according to her, he did on one occasion. Her testimony reflects a person who was conscious of her surroundings and capable of appraising the nature of her conduct.

Moreover, we note this court's opinion in State v. Grover Green, No. 01C01-9002-CC-00045, Grundy County (Tenn. Crim. App. Oct. 3, 1990), in which the defendant was convicted of assault with the intent to commit sexual battery in which the victim was alleged to be mentally defective. The victim, a nursing home resident, was shown to have irreversible brain damage because of a brain stem injury she suffered as a child. However, this court stated that the burden to prove that her mental defect met the specific statutory definition was upon the state, including the requirement that she be incapable of appraising the nature of her conduct. The in-house doctor for the nursing home testified that "more than half of the time, the victim could understand the consequences and repercussions of her actions." This court concluded that the evidence was insufficient to show beyond a reasonable doubt that the victim was incapable of appraising the nature of her conduct. In doing so, the court indicated that proof that meets the statutory definition of mentally defective should ordinarily come from a psychologist, psychiatrist, or other expert medical personnel.

In the instant case, as in Green, the state failed to introduce sufficient evidence to show that the victim had a mental defect as defined by statute. Thus, the defendant cannot be convicted for a sexual battery against C.S. as charged in the indictment.

## III. CONSOLIDATION/SEVERANCE

The defendant contends that the trial court's failure to sever the cases tainted each case and requires a reversal. The state first responds that the defendant has waived the issue by failing to cite to the record and failing to cite to any authority on this issue in his brief. The state also argues that a severance was not required because the offense events were similar, close in time and place, involving sisters in the same household, and the evidence of one was admissible in a trial of the other.

The defendant is required on appeal to make appropriate references to the record in the argument portion of his brief and to cite relevant authority. See T.R.A.P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Failure to do so will ordinarily constitute a waiver of the issue. See State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). In the present case, there is only one reference to the record in the argument and no mention of any authority that bears on the issue of consolidation or severance.[1] Under these circumstances, it is not the obligation of an appellate court to review this issue as it is presented. In any event, the defendant's position in the trial court did not preserve an appellate issue regarding severance.

Each alleged offense was the subject of a separate indictment. On the morning of trial, upon inquiry by the trial court, the state said that the two indictments were to be tried together. The defendant objected, essentially claiming that the fact that there were two charges would prejudice the jury into assuming guilt from the multiple charges, not the facts of any particular case. The state argued that the offenses occurred in the same time frame and that the witnesses would be needed in both cases, noting, as well, that out-of-state witnesses were involved. The trial court concluded from the statements of counsel, the record, and the indictments that the alleged offenses occurred on or about the same time and that judicial economy would be best served in a joint trial. The jury instructions given by the trial court state that the

---

[1] Actually, the one record reference is made in the argument on the issue of the sufficiency of the evidence in the C.S. case, which the defendant's brief says should be considered on the severance question.

indictments had been consolidated for trial, but the jury was to treat the charges as separate and distinct indictments.

Mandatory joinder of offenses is required "if the offenses are based upon the same conduct or arise from the same criminal episode . . . ." Tenn. R. Crim. P. 8(a). Also, offenses are permitted to be joined for trial if they constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b). Offenses that are consolidated under Rule 8 may be severed in accordance with Rule 14, Tenn. R. Crim P.

At the time of the consolidation, the trial court was given sufficient information to justify its allowing the cases to be joined for trial. In support, we note that the state's proof showed similar offenses against sisters in the same household with the same persons present. For both victims, the conduct occurred while the defendant and the victim were on the couch in the living room. Under these circumstances, it was appropriate to consolidate the cases.

On the other hand, the consolidation order did not prevent the defendant from seeking a severance during the trial as the evidence developed. See Tenn. R. Crim. P. 14(b)(2)(ii). However, the defendant did not request a severance during the trial. Thus, even if the evidence developed so as to show that a severance might be warranted, the failure of the defendant to seek a midtrial severance is significant. Under all of the circumstances, we will not fault the trial court for consolidating the offenses.

## IV. VICTIMS' STATEMENTS

The defendant contends that the trial court erred in admitting the victims' statements to Detective Beard as fresh complaint. The state responds that the defendant requested that the written statement of C.S. be introduced and that he did not object to the admission of S.T.'s statement. It contends that the defendant invited

any error.  The state also argues that the statements were properly admitted as fresh complaints of sexual assaults.

The state sought to introduce through Detective Beard statements made by C.S. during his taped interview with her.  The state attempted to introduce a transcript of the interview into evidence.  The defendant objected, claiming that the statements were hearsay.  The state contended that the statement was fresh complaint and that for the sake of judicial economy, they were presenting it while the detective was on the stand rather than recalling him after C.S. had testified.

In a jury-out hearing, Detective Beard testified that C.S. stated that the defendant had inserted his finger into her vagina on two occasions, once in Mississippi before they moved to Tennessee, and again in Tennessee.  He testified that C.S. said that the defendant sexually abused S.T. by having her masturbate him at the house in Collierville.  The detective stated that C.S. also said that she, S.T. and a niece of the defendant performed oral sex with the defendant on different occasions.

The defendant objected to the detective's testimony as being both conclusory and hearsay.  In argument, the defendant also stated that if the trial court were to allow Detective Beard to testify, the defendant would rather have the interview transcript introduced in order that the detective would not be testifying only through recollection.  The trial court then ruled that Detective Beard's testimony was admissible and, given the defendant's position, that the interview transcript was also admissible.  The trial court stated that the prosecution had shown the proper predicate to allow the testimony under the then existing hearsay rules.  The thirty-five-page transcript was admitted into evidence, and as previously noted, Detective Beard read substantial excerpts from it.

Detective Beard also testified that he and Dean Grisby interviewed S.T. at police headquarters.  The state sought to introduce the eighteen-page transcript of

S.T.'s interview into evidence, to which defense counsel stated that there was no objection. Again, Detective Beard testified to the details of his interview with S.T. by reading from the transcript.

We agree with the state that the defendant has not preserved any issue relative to S.T.'s statements. By stating that there was no objection to the admission into evidence of the transcript of S.T.'s statements, the defendant waived any right to complain about the admissibility of that evidence. See T.R.A.P. 36(a).

On the other hand, we conclude that the defendant preserved the issue regarding the admission of the statement by C.S. as fresh complaint. Our review of the record convinces us that the defendant did not agree to or acquiesce in the use of the substance of C.S.'s statements. He only preferred the use of the transcript as opposed to Detective Beard testifying from memory. Thus, whether the trial court correctly admitted the statements is properly before us.

First, we note that the statement by C.S., depicted by the transcript and Detective Beard's testimony, was not admissible as an exception to the hearsay rule of exclusion. See Tenn. R. Evid. 801 and 802. Thus, it was not admissible for the purpose of proving the truth of its contents. Id.

The state asserts that the statement constitutes an admissible fresh complaint. Essentially, the fresh complaint doctrine allows the state to introduce evidence in its case-in-chief that a sexual assault victim complained about the assault shortly after it occurred. See, e.g., Phillips v. State, 28 Tenn. (1 Humphrey) 246, 248-49 (1848). The purpose was to prevent an inference that the assault did not take place because a complaint was not immediately made. Historically, Tennessee has allowed the details of the fresh complaint to be admitted, as well. Id. The fact that a victim immediately complained and the details of the complaint served to corroborate the

13

victim's trial testimony. As corroboration, it has not been considered as substantial evidence.

However, our supreme court substantially limited the use of fresh complaint evidence in Tennessee after the present case was tried. In State v. Kendricks, 891 S.W.2d 597, 603 (Tenn. 1994), the supreme court limited the fresh complaint evidence in a case involving an adult victim to the fact of the complaint, thereby excluding the details of the complaint. Also, in State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995), the supreme court held that neither the fact nor the details of a complaint are admissible under the fresh complaint doctrine if the victim is a child. The court concluded that the potentially negative inferences that may be drawn from an adult's silence after an alleged sexual offense would not apply to the silence of a child victim. Id.

Of preliminary concern is the question of whether either case applies to the circumstances in the present case. This case was tried before either Kendricks or Livingston was decided. In Kendricks, our supreme court stated that its holding "applies to all cases tried after the release of this opinion and to those wherein a motion for new trial was granted on or after the date of the release of this opinion." 891 S.W.2d at 606. This means that if C.S. is considered an adult, Kendricks would not apply because the present trial occurred before Kendricks was decided. On the other hand, Livingston was silent as to its application, and the supreme court has applied it in a case in which the trial occurred before either Kendricks or Livingston was released. See State v. Speck, 944 S.W.2d 598 (Tenn. 1997). Thus, if C.S. is considered to have been a child, Livingston would apply so as to bar complete use of her out-of-court statement for fresh complaint purposes.

The supreme court has not specified what circumstances separate an adult victim from a child victim in fresh complaint cases. We note, though, that the victim in Speck was eleven years old at the time of the latest assault proven. The court

14

applied <u>Livingston</u> without any indication that anything other than the victim's age was needed. Also, we note that this court, without analysis, has stated that <u>Livingston</u>'s child victim bar to fresh complaint holding applied to a case involving a thirteen-year-old victim. <u>See</u> <u>State v. Robert J. Burton, Sr.</u>, No. 02C01-9507-CC-00193, Weakley County (Tenn. Crim. App. June 10, 1996), <u>app.</u> <u>denied</u> (Tenn. Dec. 9, 1996).

In the present case, C.S. turned thirteen two weeks before the assault was alleged to have happened. Given the evidence presented by the state in its attempt to show that C.S. was mentally defective, one could surmise that she was not as advanced as a normal thirteen-year-old. However, as we previously indicated, the evidence is too vague for us to discern the extent, if any, of any mental or other maturity deficiency.

In reviewing this issue, we believe that the supreme court contemplated a line of demarcation for application of <u>Livingston</u> similar to the legislative provisions for sexual assault victims under thirteen. Under T.C.A. § 39-13-504(a)(4), the victim being less than thirteen years of age is an aggravating circumstance of aggravated sexual battery. Under T.C.A. § 39-13-522, rape of a child involves a victim who is less than thirteen years of age. In other words, a child sexual assault victim is one who is under thirteen years of age. Thus, the doctrine of fresh complaint used before <u>Kendricks</u> applies regarding C.S.'s statement.

The defendant questions whether C.S.'s statement was "fresh" or was even a "complaint" as contemplated by the fresh complaint doctrine. Interestingly, there was conflicting evidence about when the initial complaint was made. C.S. stated that she complained fairly quickly to her grandmother, Peggy Lewis, the defendant's step-mother. However, Ms. Lewis denied being told any such thing by C.S. Also, C.S. stated that she told her mother, but her mother did not believe her. In any event, Detective Beard's and Mrs. Grisby's interview occurred at C.S.'s school some three to

four days after the events in issue, but shortly after C.S. had told a school counselor about the events.

In Kendricks, the supreme court noted that "while the complaint must be timely, it need not be contemporaneous with the underlying event. Further, a statement can be a 'fresh complaint' even if made in response to questions by law enforcement officers provided the questioning was general and neither coercive nor suggestive." 891 S.W.2d at 606. Under the record before us, we cannot say that C.S.'s statement was untimely relative to being a fresh complaint. However, the record reflects that Detective Beard and Mrs. Grisby undertook a detailed questioning of C.S. at her school. They used some leading questions, and there is an instance of a coaxing question after C.S. hesitated in discussing what happened. These give rise to a question about whether the interview, covering a myriad of topics and acts purportedly involving the defendant and others, could be characterized as a "complaint." In fact, the real problem in this case deals with the admission of parts of C.S.'s statement that had nothing to do with fresh complaint.

Of singular concern, regardless of C.S.'s status for fresh complaint purposes, is the state's presentation through her statement that the defendant committed uncharged sexual offenses upon her, S.T., and the defendant's niece. Such evidence, ruled admissible by the trial court, has no relevance to the fresh complaint doctrine upon which the state relies in this case. That is, it is not a prior statement about the offense on trial nor is it consistent with C.S.'s trial testimony so as to be directly corroborative of that testimony. See State v. Rickman, 876 S.W.2d 824, 830 (Tenn. 1994). Therefore, it was error to admit that evidence.

As far as prejudice is concerned, we note that in Rickman, a statutory rape and incest case, the supreme court concluded that the victim's testimony about "other prior unindicted sex crimes allegedly committed by the defendant upon the victim" not only did not corroborate the claim that the defendant committed the indicted

16

offense, but also involved prejudice that outweighed its probative value.  See also State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984).  In the present case, the foundation of the state's case was the credibility of the victims.  The defendant denied committing the offenses alleged in the indictments.  The defense assailed the victims' reputations for truthfulness, primarily C.S.  Under these circumstances, we conclude that the admission of C.S.'s statement relative to the defendant's prior bad acts including her, S.T. and a niece were improperly admitted into evidence and prevented the defendant from receiving a fair trial as to either victim.

## V. CONCLUSION

The defendant's aggravated sexual battery conviction regarding C.S. is vacated and the evidence is insufficient to convict him of sexual battery as charged in that indictment.  The defendant's aggravated sexual battery conviction regarding S.T. is reversed because of trial error.  These cases are remanded to the trial court for such further proceedings as are in accordance with this opinion and the law.


_____
Joseph M. Tipton, Judge


CONCUR:


_____
Joe B. Jones, Presiding Judge


_____
John K. Byers, Senior Judge