IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2019

**JOSHUA R. STARNER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. 41200170        William R. Goodman III, Judge**

_____

**No. M2018-01015-CCA-R3-PC**
_____

The Petitioner, Joshua R. Starner, appeals the denial of post-conviction relief, arguing that he received ineffective assistance of trial counsel and that counsel's actions deprived him of his right to testify at trial. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

B. Nathan Hunt and Zachary L. Talbot, Clarksville, Tennessee, for the Petitioner, Joshua R. Starner.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case stems from the abuse, neglect, and killing of the Petitioner's twenty-three-month-old stepson. State v. Joshua R. Starner, No. 2014-01690-CCA-R3-CD, 2016 WL 1620778, at *1 (Tenn. Crim. App. Apr. 20, 2016), perm. app. denied (Tenn. Aug. 18, 2016). The Petitioner and the victim's mother, Caitlyn Metz, were indicted together and jointly tried. Id.

At trial, evidence was presented showing that the Petitioner was with the victim all day on February 7, 2009, the day the victim was admitted to the hospital for his injuries, and that the codefendant was with the victim at all times that day except for a period of approximately two hours when she left to purchase groceries at a commissary on a nearby military base. Id. at *3, *10-12. When the codefendant returned from the commissary,

she immediately discovered that the victim was unresponsive and his body limp. Id. at *11. She screamed and informed the Petitioner of the victim's state, and the Petitioner called 9-1-1. Id. The emergency medical technician who responded to the scene stated that the victim was listless and unresponsive but was making some effort to breathe. Id. at *2. At the time, one of the victim's pupils was completely dilated and the other pupil was sluggish, and the victim exhibited signs of deep brain injury. Id. at *3. The victim was intubated and transported to the hospital. Id.

An officer responding to the scene spoke with the Petitioner, who was upset and crying. Id. The Petitioner told the officer that he had left the victim alone in the bathtub for a brief moment, and when he returned, the victim was lifting his head out of the water and coughing and spitting up water. Id. He did not indicate that the victim had suffered any other injuries. Id. The Petitioner claimed the victim seemed fine when he removed him from the tub and that he observed the victim in his crib for twenty to twenty-five minutes before leaving to take a shower. Id. After his shower, he checked on the victim, who seemed to be sleeping peacefully, so the Petitioner decided to lie down in his own bed and take a nap. Id. The Petitioner told the officer that he awoke when the codefendant screamed that the victim was not breathing, and he immediately called 9-1-1. Id.

Expert medical testimony established that the victim was in distress and unconscious when he arrived at the hospital. Id. at *4. The victim had injuries to his head, neck, buttocks, and genitalia; had swelling and bruising throughout his body; and had bruises around his anus. Id. A treating nurse noted that after the victim was admitted to the hospital, the codefendant stayed fifteen feet away from him. When the nurse asked the codefendant about the cause of the victim's bruises, the codefendant shrugged her shoulders and looked away. Id. The codefendant told one treating physician that the victim's bottom was red before she left to go to the commissary but that when she returned, the victim was in severe distress. Id. She told another treating physician that the victim received his eye injury four or five days earlier when he fell out of the Petitioner's jeep and hit his head on the edge of the vehicle's door. Id. A treating pediatric emergency medicine physician said the victim's symptoms at the time he was admitted to the hospital indicated he had substantial swelling of the brain, which significantly compromised his cardiovascular system. Id. at *5. This physician said the victim had multiple bruises that appeared to be more than a day old at the time of his admission. Id. He also opined, after conducting his examination, that the victim had suffered physical and sexual abuse. Id. The radiologist who read the victim's brain scan stated that the victim's brain was completely swollen, and he estimated that it had taken six to eight hours for victim's brain injury to look the way it did on the scan. Id. The radiologist said that the victim's brain scan was performed at 3:58 p.m. on February 7,

- 2 -

2009, and that six to eight hours before 3:58 p.m. would have been approximately 9:00 a.m. that day. Id.

A Child Protective Services employee who photographed the victim the day he was admitted to the hospital stated that the victim had bruises on both ears as well as bruises to his right eye, forehead, nose, chin, neck, left hand, inner thighs, genitalia, and buttocks. Id. at *6. She also noted that the victim had an abrasion near his anus. Id. She said the codefendant told her that she had spanked the victim five days prior to the victim's hospitalization and had noticed that her spanking him had caused bruises. Id. The Child Protective Services employee also stated that the codefendant's demeanor was unusual because she was not crying or visibly upset. She said that during the interview, the codefendant never asked about the victim's condition and repeatedly sent and received text messages. Id.

The medical examiner stated that the victim's cause of death was multiple blunt force injuries and that the victim's manner of death was homicide. Id. at *7. She determined that the injuries to the victim's head were the most lethal and that because of these injuries, the victim's brain swelled, which caused him to become brain dead. Id. The medical examiner noted that the bruises on the left side of the victim's face were consistent with slap or knuckle marks and that the bruises around the victim's anus and the tear at the edge of the victim's anus were consistent with penetration of the victim's anus. Id. She noted that the victim had many hemorrhages inside his eyeballs and in the nerves that connected the eyeball to the brain and that these injuries could have occurred if the victim had been forcefully shaken or if the victim's head had struck something. Id. The medical examiner said that although it was difficult to estimate when the victim received these injuries, the victim would have become immediately symptomatic to the extent that a "normal" person would have known something was wrong with the child. Id. at *8.

Evidence was presented showing that on February 7, 2009, the codefendant telephoned the Petitioner at 10:38 a.m., 10:47 a.m., 11:00 a.m., and 11:56 a.m., that the codefendant checked out with her groceries at the commissary at 12:05 p.m., and that the codefendant then called the Petitioner at 12:14 p.m., 12:18 p.m., and 12:34 p.m. Id. at *12.

A detective who interviewed the Petitioner twice on February 7, 2009, stated that the Petitioner cried throughout the interviews and asked to see the victim several times. Id. The Petitioner told the detective he had given the victim a couple of light swats for whining that day and that he believed the victim's injuries were from the victim slipping in the bathtub. Id. The Petitioner also said the bruises on the victim's buttocks were either from the victim learning to pull up his underwear or from the victim falling out of

- 3 -

the Petitioner's truck several times.  Id.  The Petitioner said that the victim's bottom would get red when he or the codefendant spanked him but that these spankings were not hard spankings.  Id.  He told the detective that he did not know how the victim sustained the injuries to his head and eyes.  Id. at *13.  The Petitioner denied hurting the victim; he said he had never seen his codefendant hurt the victim and had only seen her give the victim spankings.  Id.  He acknowledged that no one had control of the victim other than the codefendant and himself.  Id.  The detective stated that when he interviewed the codefendant on February 7, 2009, she did not seem upset, did not cry when she was writing her statement, and did not ask about the victim until the end of her statement.  Id.

At the conclusion of the proof, the jury convicted the Petitioner of aggravated child abuse, felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, felony murder committed during the perpetration of aggravated child neglect, and aggravated sexual battery.[1]  Id. at *1.  Thereafter, the trial court dismissed the aggravated sexual battery conviction, merged the felony murder conviction committed during the perpetration of aggravated child neglect with the felony murder conviction committed during the perpetration of aggravated child abuse,[2] and imposed an effective sentence of life plus fifteen years.  Id.  On appeal, this court affirmed the Petitioner's convictions.  Id. at *30.

**Post-Conviction.**  Thereafter, the Petitioner filed a timely pro se petition for post-conviction relief, alleging that trial counsel was ineffective in failing to present expert testimony that the Petitioner was not responsible for the victim's injuries, in failing to object to the prosecution's comment on his right not to testify during its closing argument, in failing to object to the comment made by codefendant's counsel during opening statements that the Petitioner was incarcerated, in failing to seek a severance of the Petitioner's trial from the codefendant's trial, and in failing to call codefendant's mother to testify about facts indicating that the codefendant planned to blame the victim's injuries on the Petitioner prior to the victim's death.  Following the appointment of counsel, the Petitioner filed an amended petition for post-conviction relief, wherein he also alleged that trial counsel was ineffective in failing to introduce evidence that the codefendant had been investigated by Oregon's Child Protective Services regarding allegations of abusive conduct toward her other child.

---

[1] The jury convicted the codefendant of aggravated child abuse, felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, felony murder committed during the perpetration of aggravated child neglect, and facilitation of aggravated sexual battery.  Joshua R. Starner, 2016 WL 1620778, at *1.  The trial court later dismissed the codefendant's conviction for facilitation of aggravated sexual battery.  Id.

[2] We have taken judicial notice of the appellate record from the Petitioner's direct appeal for these sentencing details.

- 4 -

At the April 10, 2018 evidentiary hearing, the Petitioner testified that trial counsel had been appointed approximately two years prior to his trial. He said that although he and trial counsel met a "half a dozen times" prior to trial, she failed to obtain the evidence he needed to prepare his defense, which affected the outcome of his trial.

The Petitioner said that he was married to the codefendant, the victim's mother, at the time the victim died, but he was not the victim's biological father. The Petitioner asserted that trial counsel was ineffective because she failed to present expert testimony about the victim's injuries. He noted that the victim had a slap mark on his left cheek and said, "[If] you compared [the slap mark] to [the codefendant's] hand and my hand, it would have lined up with her hand." The Petitioner stated that trial counsel never explored the issue of who was responsible for the victim's injuries, which "would have shown the abuse was clearly coming from her and not myself."

The Petitioner said he talked to trial counsel about obtaining an expert witness to testify that he had not caused the victim's injuries. He acknowledged that he failed to present such an expert to testify at the post-conviction hearing. He also admitted that there may have been a doctor or two who testified about the victim's injuries, but he claimed that trial counsel failed to adequately cross-examine these witnesses. The Petitioner said that had trial counsel properly explored this issue at trial, the evidence would have shown that the codefendant was responsible for the victim's fatal injuries.

The Petitioner also asserted that trial counsel was ineffective in failing to call the codefendant's mother to testify at trial. He claimed the codefendant's mother would have testified that the codefendant was mentally unstable in stressful situations. He said that although he talked to trial counsel about calling the codefendant's mother, trial counsel never subpoenaed her to testify on his behalf at trial. The Petitioner claimed that had the codefendant's mother been called to testify, her testimony about the codefendant's mental instability would have changed the outcome of the trial.

In addition, the Petitioner said he intended to have his brother, his father, his stepmother, and his father's best friend, who had dated the codefendant after the victim passed away, to testify about incriminating statements made by the codefendant. He said all of these witnesses were initially prepared to testify on his behalf and that State funds were going to cover their travel expenses. However, after his stepmother talked to one of the prosecutors, all of these witnesses refused to testify for him. The Petitioner stated that his brother would have testified that the codefendant said it was "sort of nice not having [the victim] around any more [sic]." In addition, he said that his father would have testified about the codefendant's "mannerisms on the day of the [victim's] funeral" and about the fact that the codefendant "didn't care that her son had passed away." The Petitioner also said his stepmother had a photograph of the codefendant "partying on the

day of the [victim's] funeral." Finally, he said that his father's best friend would have testified that the codefendant showed no "remorse, grief" about the victim's death, that she only showed emotion about the loss of her son when her own mother came over, and that when her mother left, "all [the codefendant] cared about was having fun." The Petitioner said he did not believe that trial counsel ever subpoenaed these individuals, even though he told her that he wanted these witnesses to testify on his behalf at trial. The Petitioner acknowledged that none of these witnesses were present to provide testimony at his post-conviction hearing.

The Petitioner maintained that trial counsel failed to object when the State commented on his right to remain silent and when codefendant's attorney informed the jury that he was incarcerated at the time of trial. However, he did not describe the substance of these comments, did not identify when these comments were made, and did not explain how trial counsel's failure to object to these comments changed the outcome of his trial.

In addition, the Petitioner argued that trial counsel was ineffective in failing to seek a severance of his trial from his codefendant's trial. He said trial counsel never filed a motion to seek a severance and actually told him there was no need for a severance. He admitted that he never asked trial counsel to request a severance but claimed that he "didn't know . . . it was going to be more beneficial for [him][.]" He also acknowledged that the trial court denied the codefendant's request for a severance. The Petitioner said after the trial, he learned from prison legal aid that he should have obtained a severance because it would have allowed him to testify about the codefendant's statement that it was nice not to have the victim around anymore. The Petitioner claimed he was told during a recess at trial that he could not introduce this incriminating statement against the codefendant because the codefendant was unwilling to testify at trial. He stated that when he asked trial counsel about presenting testimony about the codefendant's statement at trial, trial counsel told him that it "would cause a mistrial." The Petitioner said it was his understanding that had his trial been severed from the codefendant's, he could have presented this evidence.

The Petitioner also asserted that trial counsel was ineffective in failing to obtain records from Child Protective Services in Oregon regarding the codefendant's abuse of her other child. He claimed that this "child apparently had gone through abuse that was very similar to what had happened [with the victim] in Tennessee." The Petitioner said that although the abuse of this other child did not result in death, the abuse had the same characteristics as the victim's abuse and "would have tremendously helped [his] case." He said he informed trial counsel of these Oregon records, but he did not believe counsel made any attempt to obtain them. The Petitioner admitted that although he had subpoenaed Oregon's Department of Children's Services in an effort to obtain these

records for the post-conviction hearing, he was unable to obtain them because they were sealed. He said he was not aware of trial counsel interviewing any witnesses regarding this other child's injuries. The Petitioner admitted that he had provided no witnesses to testify at the post-conviction hearing regarding the investigation conducted by the Oregon's Department of Children's Services.

The Petitioner also maintained that trial counsel persuaded him not to testify at trial, stating:

> When I wanted to bring up the days leading up to . . . my son passing away and [the codefendant] clearly committing abuse that I wasn't aware of at the at time and my desire to get up on the stand, she told me that if I got up on the stand, it would only cause a mistrial and when [I discussed] all these other pieces of evidence I wanted to bring up, [trial counsel] was like you can't get up there and testify to it. And I am like, well what is the point of me even getting up there? Because if I can't defend myself and clearly show all that happened, what's the point of getting on the stand?.

The Petitioner stated that if not for counsel's advice, he would have testified that the codefendant lied to the military about the Petitioner being an abuser so she could receive benefits. In addition, he said he would have testified that the codefendant told him she only kept the victim around because she was receiving five hundred dollars a month in child support for him and that the codefendant often left the victim with her mother or daycare so she would not have to care for him. The Petitioner also said he had wanted to testify about the marks he had seen on the victim three days prior to the victim's death. Although he acknowledged telling the police that he did not have any idea how the victim got these injuries, the Petitioner said he was now asserting that he remembered seeing some marks on the victim that had been caused by the codefendant, even though he did not observe her giving the victim these marks. He admitted that he told police the codefendant went to the store for a couple of hours, and when she returned, the victim had been beaten to death. He also admitted that he decided not to testify at trial after trial counsel discussed the advantages and disadvantages of testifying with him. The Petitioner acknowledged that neither he nor the codefendant testified at trial.

Trial counsel also provided testimony at the post-conviction hearing. She testified she had been licensed to practice law in Tennessee since 1998 and although she acknowledged that the Petitioner's case was "[p]robably" her first murder trial, she said she had handled some jury trials prior to representing the Petitioner. Trial counsel said she met with the Petitioner more than a dozen times, both in jail and during the Petitioner's court appearances.

Trial counsel asserted that the Petitioner never asked her to retain an expert to show that the victim's injuries could not have been caused by the Petitioner. She did not recall any discussions with the Petitioner about how the victim's injuries must have been caused by someone else because of the Petitioner's hand size and the size of the victim's bruises. She said that the Petitioner repeatedly claimed he had no idea what happened to the victim and "quite often tried to protect [the codefendant] when we would talk."

Trial counsel also asserted that she talked to the Petitioner several times about whether to file a severance motion. She said the photographs of the victim "were horrific" because they showed that the child had "bruises from head to toe" and "had been beaten to death." She believed that whoever was sitting at that counsel table would be convicted. However, she said that once she and the Petitioner decided that the best strategy would be to blame the codefendant for the victim's injuries, they "wanted her sitting at the [counsel] table with [them]." Trial counsel said that having a joint trial was preferable to having an empty chair at a severed trial because it would give the jury someone to focus on other than the Petitioner. She also said the evidence supported the defense theory that the codefendant was responsible for the victim's death because several witnesses testified at trial that the codefendant was "nonchalant at the emergency room" while the Petitioner "was crying." She also said several police officers and medical personnel testified that the codefendant seemed unaffected by the victim's death while the Petitioner seemed "very distraught." Trial counsel asserted that the Petitioner never told her he wanted his trial severed from his codefendant's trial. When asked whether she still felt that the best trial strategy was to blame the codefendant in a joint trial rather than seek a severed trial for the Petitioner, trial counsel replied, "That was the only strategy that I could find."

Trial counsel stated that the Petitioner never mentioned wanting to call the codefendant's mother to testify. She said they discussed having Terrie Starner, the Petitioner's stepmother, and Johnny Kay, his father's friend, to testify, and when provisions were made for these witnesses to travel from Oregon to testify about the codefendant's previous behavior toward the victim, they refused to come because they did not want to be involved. Trial counsel said that to her knowledge, the State never discouraged these witnesses from testifying and that the State had actually helped her obtain funding to cover the travel expenses for these witnesses. Trial counsel believed that Terrie Starner and Johnny Kay would have been unable to testify as favorably as the other witnesses who observed the Petitioner and the codefendant at the emergency room. She also said the Petitioner never talked to her about having his father and brother testify on his behalf. She maintained that the codefendant's mother would not have provided favorable testimony for the Petitioner at trial. Moreover, trial counsel said she was able to elicit testimony from the State's witnesses that was favorable to the Petitioner's case.

Trial counsel said that she had a note in her file showing that she attempted to call the Oregon's Department of Children's Services in June 2013 about an investigation into the codefendant's other child, but she was unable to obtain these records because they had been sealed. She said the Oregon investigation involved an incident that occurred after the victim's death in this case. While she acknowledged that she did not obtain a court order to have a subpoena issued for these out-of-state records, she asserted that the Oregon records had nothing to do with the Petitioner or the victim in this case.

As to the Petitioner's claim that she advised him not to testify because his potential testimony regarding his codefendant would cause a mistrial, trial counsel stated that the Petitioner never wanted to say anything negative about his codefendant and that they had to "really discuss the issue of blaming her" before he finally agreed to pursue that strategy at trial. However, once they reviewed the evidence, the Petitioner was "completely on board" with blaming the codefendant. Trial counsel noted that the codefendant was convicted at trial of essentially the same offenses as the Petitioner. She said that although they had discussed the Petitioner's right to testify, the Petitioner never told her anything that could explain the victim's injuries, other than a bathtub fall, which the medical examiner had ruled out as the cause of the victim's death. Trial counsel explained that due to the extent of the victim's bruising, the Petitioner would have had to have observed these bruises at the time he put the victim in the bath or would have had to have caused or added to the victim's injuries while the codefendant was at the commissary. She said she discussed the Petitioner's decision not to testify again at the close of the State's proof. At that point, the Petitioner told her he was pleased with her performance and was happy about how the State's proof had developed at trial.

Trial counsel did not recall the State making any sort of comment about the Petitioner's right to remain silent. As to the Petitioner's claim that codefendant's counsel told the jury that he was incarcerated, she said the only thing she recalled was a comment by perhaps the State that the codefendant had spent money after the Petitioner was arrested. She said that, to her knowledge, no one commented that the Petitioner was still incarcerated at the time of his trial.

Trial counsel asserted that the Petitioner's case involved a substantial amount of medical evidence. She said she traveled to Nashville to meet with the medical examiner, and when she discussed with her the possibility of the victim having a bruising disorder, the medical examiner indicated that she did not believe the victim had this disorder. Trial counsel also met with Dr. Curtis Wushensky, who helped her determine when the victim likely received his fatal injuries. She asserted that she was prepared for the Petitioner's trial and was well aware of the evidence that would be presented by the State's experts.

Trial counsel said that, viewing the case in hindsight, there was nothing she could have done differently in her representation of the Petitioner. She declared that having the codefendant tried jointly with the Petitioner was "the most effective approach" because "having an empty chair" would have been very unfavorable to the Petitioner given the evidence in this case. She did not recall telling the Petitioner that he should not testify about the codefendant because it would cause a mistrial. She said that whenever they discussed his testifying, they also discussed the damaging proof that would be elicited regarding his explicit comments on chat logs and other acts he had done that "would not have benefitted him at all." She said that this damaging proof was never elicited because the Petitioner opted not to testify. Trial counsel said that when she asked the Petitioner about what happened when the codefendant went to the store, the Petitioner was unable to provide any information explaining the victim's fatal injuries, other than his claim that the victim had been injured during a bathtub fall. Trial counsel said she was fearful that if the Petitioner testified, the State would cross-examine him on the fact that the codefendant's father had spoken to him about not spanking the victim because it caused bruising.

On May 14, 2018, the post-conviction court entered an order denying post-conviction relief. In this order, the court made the following findings of fact and conclusions of law:

> In the Petition for Post[-]Conviction Relief and in Petitioner's testimony at the hearing on the Petition, he contends that trial counsel was ineffective in failing to present expert testimony to prove that the mark[s] on the victim were not cause[d] by Petitioner, but by the Codefendant, Caitlyn Metz. In order for expert testimony to be admissible it must satisfy the requirements of Rule 702 and 703 of the Tennessee Rules of Evidence. Petitioner has offered no evidence that expert testimony exists which could differentiate the size or gender of a person who inflicted trauma resulting in bruising, choke marks or other marks on a child depicted in a photograph or specific time of occurrence. The court is not to speculate on what might have been presented. A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363 (Tenn. 1996). Therefore this contention is found to be without merit.

> Petitioner complains that counsel was ineffective for failing to call as a witness the mother of the Codefendant, Caitlyn Metz. Other than the allegations of the Petitioner[,] there was no proof as to what the testimony of the mother of the Codefendant, Metz would have been. Assuming for

the sake of argument that the mother's testimony would have been as alleged that the child sustained bruises while living in Oregon and that the child bruise[d] easily, there is serious question as to whether such testimony would have been admissible as either relevant or if any probative value would have been [substantially] outweighed by its prejudicial effect. This court does not find that the failure to call this witness would violate either prong of Strickland.

Petitioner asserts that trial counsel was ineffective by failure to object to the prosecution commenting on the Petitioner's right not to testify. This court[,] after reviewing the portions of the trial transcript referenced by Petitioner[,] does not find the statements by the Assistant District Attorney to constitute an improper comment on the Petitioner's right not to testify.

Petitioner contends that counsel was ineffective by her failure to object to statements made by counsel for the Codefendant, Metz, that Petitioner was in jail. During Opening Statement counsel for Metz[] states that Petitioner was charged or arrested first, subsequently counsel for Petitioner in Opening Statement states that Metz proceeds to sell Petitioner's belongings while he is in jail. This court does not find that such statement prejudice[d] the Petitioner, it does not establish that Petitioner was incarcerated at the time of trial, Petitioner appeared at trial in street clothes and there were no other indications of Petitioner's status visible to the jury. This court finds that as to this issue Petitioner has failed to establish by clear and convincing proof that either prong of Strickland[] has been violated.

Petitioner contends that counsel was ineffective as result of failing to seek a severance from the Codefendant. It is noted that the request by the Codefendant, Metz, for a severance was denied. Counsel for Petitioner testified that she met with the Petitioner, discussed the case with him and that as part of the trial strategy it was decided to have the couple tried together rather than having the Petitioner tried alone. A criminal trial is a very dramatic, vibrant and tense contest involving many variables and often counsel must make quick and difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill considered. Hellard v. State, 629 S.W.2d 4, at 9-10 (Tenn. 1982). There is a reasonable basis for the decision made to have the defendants in this case tried together and therefore this court finds this contention to be without merit.

- 11 -

While not set forth in the Petition for Post[-]Conviction Relief, Petitioner testified at the hearing that counsel was ineffective by fail[ing] to call as witnesses Petitioner's father, his father's brother and a friend of his father. Counsel testified that she made contact with these character witnesses and that they declined to participate. Character witnesses which are forced to attend trial almost always offer little if any benefit. This court finds there to be no violation of the standards adopted in Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), therefore this contention is found to be without merit.

At the hearing Petitioner complained counsel failed to get into evidence a statement that Metz made to the effect that it was nice not having [the] child here. There was no proof presented that such statement was ever made or existed. Therefore this court finds that the Petitioner has failed to establish by clear and convincing evidence such allegation.

At the hearing Petitioner complained counsel failed to introduce records from the state of Oregon showing that Metz had another child in Oregon who suffered injuries. Counsel testified that such records were under seal and that part of such events occurred after the date of the offense which was the subject at trial. It is doubtful that such evidence[,] even if obtained[,] would have been found to be admissible due to the issue of relevance. This court does not find this contention to violate either prong of Strickland.

Petitioner asserts that he was denied his right to testify as a result of the actions of counsel. A review of the record does not support this contention. Counsel testified that she reviewed with the Petitioner his right to testify and that it was her advice to him not to exercise that right. The trial transcript reflects that the trial judge reviewed with Petitioner his right to testify and that he affirmed that he did not wish to do so. This court finds that the decision not to testify was freely and voluntarily made by the Petitioner. Therefore this court finds this issue to be without merit.

Following entry of this order, the Petitioner filed a timely notice of appeal.

## ANALYSIS

**I. Ineffective Assistance of Counsel.** The Petitioner contends that trial counsel was ineffective in failing to call an expert witness or to elicit evidence to show that he

was not responsible for the victim's injuries, in failing to call certain witnesses to testify at trial, in failing to object to the State's comments regarding his right not to testify, in failing to object to a comment made by codefendant's counsel that he "was in jail," in failing to seek a severance of his trial from the codefendant's trial, and in failing to present records from the State of Oregon showing that codefendant had another child who had suffered injuries. The State responds that the Petitioner is not entitled to relief because he failed to prove his claims by clear and convincing evidence.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

First, the Petitioner argues that trial counsel was ineffective in failing to call an expert witness or to elicit testimony to show that he did not cause the victim's injuries. He claims that he specifically informed trial counsel, prior to trial, that she needed to prove he was not the individual responsible for the victim's injuries and that trial counsel failed to present or elicit such evidence at trial. While the Petitioner acknowledges that he failed to present such an expert at the post-conviction hearing, he nevertheless asserts that trial counsel was deficient because she "could have potentially developed such proof by appropriate examination of the expert witnesses called by the State at trial." He also claims that trial counsel's deficiencies were prejudicial because the jury never heard expert proof tending to show that he was not responsible for the victim's injuries.

This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id. Although the Petitioner asserts that trial counsel should have called an expert to testify that he did not cause the victim's injuries, he failed to present such an expert at the post-conviction hearing, failed to provide any tangible evidence or argument as to what testimony this expert would have provided, and failed to show how such expert testimony could have changed the outcome of his trial. Because the Petitioner has failed to show that trial counsel's performance to call such an expert was deficient or prejudicial, he is not entitled to relief.

The Petitioner also contends that trial counsel was ineffective in failing to extensively cross-examine the State's expert witnesses to elicit testimony that he was not responsible for the victim's injuries. As to this issue, the Petitioner makes only a general claim of ineffectiveness and fails to explain what trial counsel should have done differently in her cross-examination of these experts or how a different cross-examination would have changed the outcome of his case, particularly in light of the overwhelming evidence of his guilt. Our review of the record shows that trial counsel effectively and meticulously cross-examined Dr. Randle Likes, Dr. Curtis Wushensky, Dr. Adele Lewis, and Dr. Thomas Abramo in an effort to show that the codefendant, rather than the Petitioner, was responsible for the fatal injuries to the victim. Because the Petitioner has failed to establish that trial counsel's cross-examination of these witnesses was deficient or prejudicial, the Petitioner is not entitled to relief on this issue.

Second, the Petitioner contends that trial counsel was ineffective in failing to call certain witnesses at trial. He specifically asserts that trial counsel should have called the codefendant's mother, who would have testified that she had warned him not to have a relationship with the codefendant because she was mentally unstable. The Petitioner claims trial counsel never investigated the codefendant's mother and never subpoenaed her to testify at trial. The Petitioner also contends that trial counsel should have called the Petitioner's brother, his stepmother, his father, and his father's friend to testify at trial because they could have testified about the codefendant's "callous response to the death of the victim[,] which would have been corroborated by the other witnesses (from the hospital) who testified at trial." He also claims these witnesses could have testified about comments made by the codefendant, which "tend[ed] to show that she enjoyed not having to care for the victim." The Petitioner states that he informed trial counsel about these witnesses, and that plans were made to transport these witness to trial, but trial counsel, at some point, "ceased any effort to secure their presence."

We agree with the post-conviction court that the Petitioner did not explicitly include in his post-conviction petitions a claim of ineffective assistance of counsel based upon trial counsel's failure to call the Petitioner's brother, his father, his stepmother, and his father's friend to testify at trial. However, the Petitioner did generally allege in his petitions that he received ineffective assistance of trial counsel. See Marlon Yarbro v. State, No. W2017-00125-CCA-R3-PC, 2018 WL 4441364, at *6 (Tenn. Crim. App. Sept 17, 2018). At the post-conviction hearing, the Petitioner provided extensive testimony about trial counsel's ineffectiveness in failing to call his brother, his stepmother, his father, and his father's friend to testify at trial, and the State cross-examined him on this ground and never objected on the ground that the Petitioner had failed to include this claim in any of his post-conviction petitions. Cf. Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004)

- 15 -

("[A]n issue raised for the first time on appeal is waived."); see Steven Tyler Nabi v. State, No. M2017-00041-CCA-R3-PC, 2018 WL 1721869, at *2 (Tenn. Crim. App. Apr. 9, 2018) (concluding that an issue was reviewable on the merits when the Petitioner raised the issue at the post-conviction hearing and the State failed to object that the issue was waived on the basis it had not been included in the pro se or amended petitions). Had the State objected, the Petitioner could have amended his petition, which the Post-Conviction Procedure Act and the Tennessee Rules of Post-Conviction Procedure clearly contemplate and freely allow. See Tenn. Code Ann. § 40-30-104; Tenn. Sup. Ct. R. 28, § 8(D)(5). For these reasons, we conclude that the Petitioner did not waive his issue regarding trial counsel's failure to have his brother, his stepmother, his father, and his father's friend to testify at his trial.

While trial counsel's failure to call these witnesses is reviewable on their merits, we nevertheless conclude that the Petitioner has failed to establish that trial counsel was ineffective in failing to call them. The Petitioner failed to present any of these witnesses at the post-conviction hearing, and this court will not speculate on "what a witness's testimony might have been if introduced[.]" Black, 794 S.W.2d at 757. Moreover, the proof at the post-conviction hearing showed that the few witnesses who initially indicated they would testify for the Petitioner ultimately decided that they did not want to be involved. We also do not believe that the codefendant's mother would have provided favorable testimony for the Petitioner at the Petitioner's and codefendant's joint trial. For all these reasons, the Petitioner is not entitled to relief on this claim.

Third, the Petitioner asserts that trial counsel was ineffective in failing to object to the prosecution's comment on his right not to testify and in failing to object to the comment made by codefendant's counsel that the Petitioner was incarcerated. He claims that trial counsel's failure to object to these comments was deficient and had a "prejudicial effect upon the jury's view of Appellant." Initially, we note that the Petitioner risked waiving this claim by failing to reference the portions of the record related to these issues. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Willis, 496 S.W.3d 653, 716 (Tenn. 2016) (citing State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997)).

Waiver notwithstanding, we conclude that the Petitioner is not entitled to relief on these claims. The post-conviction court found, after reviewing the trial transcript, that the

- 16 -

prosecutor had not made an improper comment on the Petitioner's right to testify, and the record fully supports this finding. We have reviewed the entire trial transcript, including the opening and closing arguments, and have failed to see anything that would amount to a comment on the Petitioner's right not to testify. During closing argument, the prosecutor explained that the statements given by the Petitioner and the codefendant included "what they had to say about the day that [the victim] died." Later, the prosecutor stated that the Petitioner and the codefendant "refuse[d] to tell us in their statements" what happened to the victim. The prosecutor's comments clearly refer to the Petitioner's and the codefendant's failure to disclose in their statements to police who was responsible for the victim's fatal injuries. Because we agree with the post-conviction court's conclusion that trial counsel was not ineffective in failing to object to these comments or any other statements made by the prosecution during his trial, the Petitioner is not entitled to relief on this claim.

Regarding the Petitioner's claim that trial counsel failed to object to the comment made by codefendant's counsel about the Petitioner's incarceration, the post-conviction court found that codefendant's counsel stated during his opening argument that the Petitioner was charged or arrested first and then Petitioner's counsel stated in her opening argument that the codefendant proceeded to sell the Petitioner's belongings while he was in jail. The post-conviction court then concluded that trial counsel was not ineffective in failing to object to codefendant's counsel's comment. In particular, the court held that the statement made by codefendant's counsel did not prejudice the Petitioner because it did not establish that Petitioner was incarcerated at the time of trial. The court noted the Petitioner appeared at trial in street clothes, and there were no other indications that the Petitioner was incarcerated at the time of trial that were visible to the jury. The record fully supports the findings of fact and conclusions of law made by the post-conviction court regarding this claim. Because the Petitioner has failed to show how trial counsel's failure to object to codefendant counsel's statement was deficient or prejudicial, the Petitioner is not entitled to relief.

Fourth, the Petitioner argues that trial counsel was ineffective in failing to seek a severance of his trial from his codefendant's trial. He claims he relied upon trial counsel's advice regarding the severance issue and later learned, on post-conviction, that severance of his trial from the codefendant's trial was necessary. The Petitioner asserts that trial counsel's decision not to seek a severance was both deficient and prejudicial because it prevented him from presenting evidence relating to his codefendant's culpability.

"In order to succeed in proving ineffective assistance of counsel with respect to counsel's failure to file a motion . . . , [the petitioner] must satisfy both prongs of the Strickland test, showing that counsel's failure to file the motion was deficient and that the

deficient performance prejudiced the defense." Vaughn, 202 S.W.3d at 120 (citing Strickland, 466 U.S. at 687). The Petitioner must show a reasonable probability that, had the severance motion been filed, the outcome of his trial would have been different. See Strickland, 466 U.S. at 694; Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."); Gary Randall Yarnell v. State, No. E2004-01762-CCA-R3-PC, 2005 WL 1981471, at *5 (Tenn. Crim. App. Aug. 15, 2005) ("To prevail on either or both of these ineffective-assistance complaints, the petitioner must demonstrate that the motions were meritorious.").

At the post-conviction hearing, the Petitioner testified that he learned after his trial that he should have obtained a severance because it would have enabled him to testify about incriminating statements made by the codefendant. However, trial counsel testified that having a joint trial was preferable to having an empty chair at the Petitioner's severed trial because it gave the jury someone else to blame for the victim's injuries. She also said that there was substantial evidence to support the theory that the codefendant was responsible for the victim's injuries in light of her demeanor and behavior following the victim's admission to the hospital and that a joint trial was the only strategy she could find in a truly "horrific" case in which the victim died. In its order denying relief, the post-conviction court did not make any findings as to whether it would have granted the motion to sever but did note that the trial court denied the codefendant's pretrial request for a severance. The post-conviction court also concluded that there was "a reasonable basis for [trial counsel's] decision . . . to have the defendants in this case tried together[.]"

We may not second-guess the strategic choices made by trial counsel unless they were uninformed ones based on inadequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). After reviewing the record, we conclude that trial counsel's decision not to seek a severance in order to allow the jury to determine whether the Petitioner or the codefendant was responsible for the victim's injuries in a joint trial was an informed one based upon adequate preparation. Moreover, the Petitioner has failed to show that had a severance motion been filed, it would have changed the outcome of trial. See State v. Dellinger, 79 S.W.3d 458, 468 (Tenn. 2002) ("Severance is not required when the evidence admitted at trial would have been admissible against each defendant at separate trials."); State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) ("[T]he [S]tate is entitled to have the guilt determined and punishment assessed in a single trial where two or more persons are charged jointly with a single crime, unless to do so would unfairly prejudice the rights of the defendants."); Black, 794 S.W.2d at 758 (affirming the denial of post-conviction relief for failure to file a severance motion when there was "neither

factual nor legal basis for the granting of a severance" and when the codefendant's severance motion had been denied). We do not believe that the limited testimony that the Petitioner claims he would have provided in a severed trial would have changed the outcome of his trial in light of the overwhelming evidence of his guilt that was presented. Because the Petitioner failed to prove there is a reasonable probability that, had a motion to sever been filed, the outcome of his trial would have been different, the Petitioner is not entitled to relief.

Fifth, the Petitioner contends that trial counsel was ineffective in failing to introduce records from the State of Oregon showing that the codefendant had another child who suffered injuries. The Petitioner asserts that these records would have shown "a pattern of treatment of children under [the codefendant's] care" and that had these records been admitted, they would have "shifted blame" away from him and toward his codefendant. In its order denying relief, the post-conviction court noted that trial counsel testified that these Oregon records had been sealed and referred to events that occurred after the offenses in the Petitioner's case. It held that even if such records had been obtained, it was doubtful that they would have been admitted at trial because they were irrelevant to the facts at issue in this case. The court then concluded that trial counsel's failure to introduce these records was neither deficient nor prejudicial. Because the record fully supports the post-conviction court's conclusion regarding this claim, the Petitioner is not entitled to relief.

**II. <u>Denial of Right to Testify at Trial.</u>** The Petitioner also contends that trial counsel denied his right to testify at trial. He asserts that trial counsel's defensive strategy was to have a joint trial in order to avoid having an "empty chair" at a severed trial and claims that counsel's repeated warnings that a mistrial would occur if he elected to testify "effectively discourag[ed] him from exercising his right to be heard." The State responds that the Petitioner failed to show that trial counsel's actions deprived him of his right to testify.

Here, in contrast to an ineffective assistance of counsel claim cognizable under the Sixth Amendment, the Petitioner appears to raise a free-standing constitutional claim that trial counsel denied the Petitioner of his fundamental right to testify as "guaranteed both by Article 1, section 9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution." <u>Momon v. State</u>, 18 S.W.3d 152, 155 (Tenn. 1999). Yet, as we will explain, the Petitioner has failed to prove by clear and convincing evidence that he was denied this fundamental right.

Once again, the record shows that the Petitioner did not include this particular claim in either of his post-conviction petitions. However, when the Petitioner provided substantial testimony about how trial counsel deprived him of his right to testify at trial,

the State cross-examined him on this issue and never objected on the basis that the Petitioner had failed to include this claim in his petitions. See Walsh, 166 S.W.3d at 645; Cauthern, 145 S.W.3d at 599; see also Steven Tyler Nabi, 2018 WL 1721869, at *2. Had the State objected, the Petitioner could have amended his petition. See Tenn. Sup. Ct. R. 28, § 8(D)(5). Accordingly, we conclude that this issue is reviewable on the merits.

A criminal defendant has a constitutional right to testify at trial. Momon, 18 S.W.3d at 157. Because the right to testify at one's own trial is a fundamental right, this right must be personally waived by the defendant. Id. at 161. In order to ensure that the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify, defense counsel must show at a hearing on the record and prior to the conclusion of the proof but outside the presence of the jury, that the defendant knows and understands:

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

Id. The Tennessee Supreme Court subsequently clarified that a defendant may waive his or her right to testify either by engaging in the voir dire procedure outlined above or by signing a written waiver of the right to testify. Momon, 18 S.W.3d 152 (Tenn. 1999), opinion on petition to rehear, 18 S.W.3d at 175 (comparing Tenn. R. Crim. P. 23, which permits a written waiver of the right to a jury trial, and State v. Muse, 967 S.W.2d 764, 768 (Tenn. 1998), which held that the right to be present during the voir dire of the jury may be personally waived by the defendant in writing or on-the-record in open court). The court held that the written waiver of the right to testify should not be executed before the close of the State's case-in-chief and must establish that the defendant knew and understood the aforementioned items (1)-(3). Id.

The record in this case shows that after the State closed its case-in-chief, the Petitioner signed a written waiver of his right to testify, and the trial court, prior to accepting this waiver, confirmed with the Petitioner outside the presence of the jury that the signature on the written waiver belonged to the Petitioner, that the Petitioner understood the rights contained within the waiver, and that the Petitioner was waiving his right to testify.

Although the Petitioner generally claims that trial counsel deprived him of his right to testify, he fails to acknowledge that he signed a written waiver of his right to testify at trial. He also failed to include this written waiver in the appellate record. Because the Petitioner failed to include his written waiver, which contained critical information about his awareness of his rights, we must presume that the post-conviction court's denial of relief was supported by the evidence. See State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). In its order denying relief, the post-conviction court found that the record, which showed that the Petitioner made his decision not to testify freely and voluntarily, did not support the Petitioner's claim that trial counsel denied the Petitioner of his right to testify. The evidence presented at the post-conviction hearing does not preponderate against the post-conviction court's finding. Moreover, to the extent that the Petitioner asserts this issue within the context of an ineffective assistance of counsel claim, we conclude that he has failed to show that counsel's performance as to this issue was deficient or prejudicial. Accordingly, the Petitioner is not entitled to relief.

## CONCLUSION

The Petitioner is not entitled to post-conviction relief. Accordingly, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE