IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 25, 2020

## COREY MITCHELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-03935      John W. Campbell, Judge
_____

### No. W2019-02267-CCA-R3-PC
_____

Following the reversal and remand of this case for a new evidentiary hearing, Corey Mitchell v. State, No. W2016-01818-CCA-R3-PC, 2018 WL 3005379, at *7 (Tenn. Crim. App. June 14, 2018), the post-conviction court again denied relief to the Petitioner, Corey Mitchell. In this appeal, the Petitioner argues that he received ineffective assistance of counsel, that his guilty plea was unknowing and involuntary, and that his plea should be withdrawn to correct manifest injustice. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Jason M. Matthews, Memphis, Tennessee, for the Petitioner, Corey Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Following a February 2, 2013 "drive-by" shooting in which the victim, Jeremiah Mays, was shot twice in the leg, the Petitioner was indicted by the Shelby County Grand Jury for attempted first degree murder, aggravated assault, and employing a firearm during the commission of a felony. Id. at *1.

**Plea Submission Hearing.** At the April 7, 2014 plea submission hearing, the Petitioner stipulated that he and his co-defendant, Robert Lindiment, confronted the victim around 11:00 p.m. on February 2, 2013, in Shelby County, Tennessee. The Petitioner and

his codefendant, who were in a rival gang, were upset with the victim because they believed he was involved in a prior shooting, and he had flirted with their girlfriends. An argument between the men escalated, and after the victim possibly pulled a gun on the men, the Petitioner drove a vehicle while his codefendant fired his weapon at the victim, striking him twice in the leg. The victim subsequently identified the Petitioner and his codefendant in a photographic lineup and confirmed that the Petitioner was the driver and that the codefendant was the shooter. The codefendant later gave a confession acknowledging that he was the shooter and that the Petitioner was the driver of the vehicle. Several Facebook pages related to the Petitioner and the codefendant contained photographs of guns very similar to those described by the victim.

After the Petitioner stipulated to the factual basis for his guilty plea, the trial court conducted a plea colloquy with the Petitioner's codefendant, and the Petitioner acknowledged that he had heard the trial court's explanation of the rights belonging to the codefendant, who was charged with the same offenses and who also entered a guilty plea to attempted first degree murder in exchange for a fifteen-year sentence at thirty percent. Thereafter, the trial court conducted the Petitioner's plea colloquy, wherein the Petitioner stated that he signed his petition for waiver of a trial by jury after reviewing it with trial counsel. The trial court asked the Petitioner if he understood that he had the right to plead not guilty and demand a jury trial, the right to confront the State's witnesses, the right to subpoena witnesses in his defense, the right against self-incrimination, the right not to testify, the right to testify, the right to appeal, and the right to an attorney on appeal at the State's expense. The Petitioner acknowledged that he understood all of his rights and that he wished to waive these rights and accept the State's offer of fifteen years at thirty percent. The trial court asked the Petitioner if he was "doing this freely and voluntarily," and the Petitioner replied, "Yes, sir." The trial court also asked if the Petitioner had any questions, and the Petitioner answered, "No, sir."

The trial court then determined that the Petitioner was "entering this guilty plea . . . freely and voluntarily." It accepted the Petitioner's guilty plea to attempted first degree murder, a Class A felony, and sentenced him as a Range I, standard offender to a fifteen-year sentence at thirty percent release eligibility. Id. at *1. A nolle prosequi was entered for the Petitioner's remaining charges. Id. However, prior to concluding this hearing, the trial court, the Petitioner's trial counsel, and the Petitioner had the following exchange:

| Trial Court: | Oh, there's one thing I noticed on here, [trial counsel]. You marked [W]orkhouse. This is Tennessee Department of Correction[]. |
| --- | --- |
| Trial Counsel: | I understand that, Your Honor. |

- 2 -

| Trial Court: | Does [the Petitioner] think he's going to be serving this at the [W]orkhouse? |
|---|---|
| Trial Counsel: | Well we've heard that if your term is at a certain low percentage, with some people they have been keeping them at the penal farm. But my understanding is it's at the Department of Correction[]? |
| Trial Court: | Right. It's up to them but we have to mark this Tennessee Department of Correction[]. Now they have been keeping a lot of people out there on long sentences but it's up to them. Do you understand that, [Petitioner]? |
| The Petitioner: | Yes, sir. |
| Trial Court: | Now they may keep you out there if they want to. It's up to them. Where they house you I have no control over, okay. The law says that I have to mark Tennessee Department of Correction[] on this judgment sheet, okay. |
| The Petitioner: | Yes, sir. |
| Trial Court: | With that in mind do you still wish to enter this guilty plea? |
| The Petitioner: | Yes, sir. |

**Post-Conviction.** The Petitioner filed a timely pro se petition for post-conviction relief, see Tenn. R. Sup. Ct. 28, § 2(G); Tenn. R. Crim. P. 49(d)(1), alleging that he was denied the effective assistance of counsel and that his guilty plea was involuntarily and unknowingly entered. Thereafter, the Petitioner was appointed two different post-conviction counsel, who each filed an amended post-conviction petition reiterating that the Petitioner had received ineffective assistance of counsel and that the Petitioner's guilty plea was involuntary and unknowing.

At the Petitioner's first evidentiary hearing, which took place on August 16, 2016, the post-conviction judge considered the plea submission hearing transcript and abruptly

halted the hearing without allowing trial counsel to testify after it determined that the Petitioner was testifying untruthfully. Id. at *2-5. The post-conviction court then denied relief. Id. at *5. The Petitioner timely appealed, arguing in part that "he was denied his right to a full and fair hearing because 'he was not allowed to examine the attorney from whom he received ineffective assistance of counsel.'" Id. On appeal, this court agreed, and it reversed the judgment of the post-conviction court, recused the post-conviction judge who presided over the August 16, 2016 hearing, and remanded the matter for a new evidentiary hearing. Id. at *6-7.

On September 6, 2019, a different post-conviction judge conducted a new evidentiary hearing in the Petitioner's case. At this hearing, the Petitioner testified that trial counsel represented him on the charges in this case and that he ultimately "signed a plea deal for 15 years at 30 percent" in exchange for his guilty plea to attempted first degree murder. Nevertheless, the Petitioner insisted that he had wanted to go to trial. When asked why he entered his guilty plea for a sentence of fifteen years instead of going to trial, the Petitioner stated:

> [M]y lawyer told me that . . . I was going to do four and a half years and I was going to go to the [W]orkhouse, which is the penal farm. And I was going to get . . . 41 days a year. That I was going to get good time and I was going to go to the penal farm.

The Petitioner said that trial counsel specifically informed him that his sentence would be served at the Shelby County Corrections Center, also known as the penal farm or Workhouse, rather than at a Tennessee Department of Correction (TDOC) facility.

The Petitioner next identified the judgment sheet he signed when he entered his guilty plea. He said that when he signed this judgment sheet, the box indicating that his sentence would be served at the "Workhouse" was checked. However, he noted that this box had been scratched through and the box for "TDOC" had been checked. After reviewing the transcript of the plea submission hearing, the Petitioner acknowledged that the trial court had informed him that the judgment sheet would have to be marked "TDOC" because the Tennessee Department of Correction determined where he would serve his sentence, and the Petitioner replied, "Yes, sir." He also acknowledged that when the trial court asked if he still wished to enter his guilty plea," the Petitioner replied, "Yes, sir." Despite these acknowledgements, the Petitioner insisted, based on trial counsel's representations at the time of his guilty plea, that he believed he was going to serve his sentence at the Shelby County Corrections Center. He said that after the trial court

provided its explanation regarding his sentence, he still thought he was "going to go to the [W]orkhouse because [the trial court] said it's up to [the TDOC]."

The Petitioner asserted that he wrote to trial counsel "multiple times asking for [his] discovery package [and] asking . . . for him to visit[.]" He also had his family contact trial counsel multiple times but never received a response. The Petitioner maintained that he did not receive his discovery packet until April 7, 2014, the day he entered his guilty plea.

The Petitioner stated that he met with trial counsel only "[t]hree times," all of which were during his court dates, and that trial counsel never met with him at the jail. When asked about the amount of time trial counsel spent with him, the Petitioner stated that the first time he met with trial counsel was for "ten minutes, when he came to [him] with the plea deal[,]" the second time was for "two minutes[,]" and the third time, when he signed his plea agreement, was for "15 to 20 minutes at the most."

The Petitioner also claimed that his guilty plea was not freely and voluntarily entered. He said that when he finally received his discovery, he realized there were "loops . . . inside [his] discovery package, and [he] felt like if [he] went to trial, [he] had a better chance of winning[.]" The Petitioner explained that by "loops," he meant there were issues and defenses that could have been raised at trial. He said one of these defenses was that although the victim had been unable to identify him and his codefendant in several photographic lineups, on the day they were arrested, the victim suddenly identified both him and his codefendant as the perpetrators. When asked whether he talked to trial counsel about the fact that he had been misidentified by the victim, the Petitioner replied, "We never got a chance to even do that because . . . we never went over my case." He asserted that trial counsel never talked to him about the nature of his charges or the length of his sentences.

After reviewing the plea submission hearing transcript, the Petitioner admitted he had told the trial court that trial counsel had reviewed the petition for waiver of a trial by jury with him. However, the Petitioner denied that trial counsel ever reviewed the petition with him before he signed it. When asked why he told the trial court otherwise during the hearing, the Petitioner responded, "Because . . . I already had signed for the time and I was just—really just ready to get it over with." He claimed that he never understood the rights he was waiving by entering his guilty plea. He also stated that trial counsel told him he could receive thirty years at trial and that this was the best offer that he could get for him. Although the Petitioner admitted telling the trial court that he was entering his plea freely and voluntarily, he claimed, "I was young at the time and . . . I thought my lawyer [was acting in my] best interest[s][.]" The Petitioner acknowledged that although the trial court asked him if he had any questions before he entered his plea, he failed to do so, claiming he did not know enough to have any questions.

- 5 -

On cross-examination, the Petitioner stated that trial counsel told him to say "yes" to all of the trial court's questions at the plea submission hearing. However, he admitted he replied, "No," when the trial court asked him if he had previously entered a guilty plea in a court of law. When the State asked him if he had never really wanted to go to trial because he "just wanted to get it over with," the Petitioner replied, "Yes, sir." He admitted that he knew he had the option of proceeding to trial or entering his guilty plea. The Petitioner also admitted that he and trial counsel had discussed the possibility of receiving a sentence of thirty years at trial. He acknowledged that he did not want to be sentenced to thirty years and that he had wanted to conclude his case at the time he entered his plea. The Petitioner conceded that he was present when the trial court reviewed his codefendant's rights before the codefendant pled guilty. He also admitted that the trial court reviewed his rights with him and explained that the judgment sheet had to be marked "TDOC" and that after hearing this, he confirmed that he still wanted to enter his guilty plea. Although the Petitioner admitted that the real reason he filed his petition was because he received a fifteen-year sentence at the TDOC, rather than the penal farm, and because he had been denied parole twice, he insisted that he had been working on this petition "since 2014."

Trial counsel, who also testified at this evidentiary hearing, recalled that this was a "drive-by case" and that the Petitioner had entered his guilty plea on April 7, 2014. Trial counsel said that at the time of the Petitioner's plea, he had worked at the Public Defender's Office for five years. He said the Petitioner's case "was one of [his] first few A felonies that [he] would have been on the hook to go to trial on[.]"

Trial counsel noted that the Petitioner's case had been pending in the criminal court for "probably four or five months" when he started working on it and that once he began representing the Petitioner, he examined the discovery right away and reviewed this discovery with the Petitioner. He said he met with the Petitioner "[a]t least three or four" times. Trial counsel detailed what he recalled about the Petitioner's case:

I remember [the Petitioner's] face. I remember he gave a confession in this case, a partial confession. He admitted to being there. He didn't admit to any kind of—having a gun or shooting or anything, but he did admit to knowing all these people, being with them on the day. I remember in discovery, he was identified by the victim, who had been shot several times. I remember the codefendant's girlfriend also put them at the scene too. . . .

I remember one of the meetings with him, he wanted an aggravated assault deal because . . . he wanted to argue that they were just trying to hurt this guy and not trying to kill him. I remember we talked about that's a jury question as to what they think his intent was.

I remember we talked about potential sentencing in this case. I remember explaining criminal responsibility to him. I remember using the— that the getaway driver is the—the classic criminal responsibility situation, and that the State would try to argue he was the getaway driver. And I remember talking about the deal with him. I remember telling him his exposure was in the 30's of years, but he got a deal where they would drop the employing a firearm charge and just let him take the minimum for attempt murder one . . . .

I remember talking to him about how [the trial court] tends to sentence people . . . toward[] the higher end of their ranges. He can be kind of a tough sentencer. And I told him that if I was in his shoes, I wouldn't want to be sentenced by [the trial court], so I do remember recommending that he take the State's deal.

As for how many times we talked about that, I don't remember the exact number of . . . times we met with him. I don't know if I ever went to visitation down in the jail, but I do remember meeting with him in these interview rooms behind the courtroom at length for hours at a time across his various court dates, report dates that we had. So that's my recollection.

Trial counsel stated that he did not remember whether he did an investigation in the Petitioner's case. When questioned about not meeting with the Petitioner at the jail, trial counsel responded that he did not recall going to the jail but that he met with the Petitioner "in the courtroom lockup." Trial counsel then asserted, "[A]nything we needed to talk about, we could talk about in the interview room behind the courtroom. Unless there was some special circumstance where I needed to rush down there and talk to him, it's just logistically easier to talk to him on his report dates here."

When asked about whether he remembered talking to the Petitioner about the amount of time he would actually serve on a fifteen-year sentence, trial counsel stated:

I don't remember specifically, no, but I . . . do remember advising him what his exposure would be at trial. That attempt murder one could carry 15 to 25 years, that he'd have to get—if he was convicted of employing a firearm, it'd be six years mandatory consecutive, 100 percent. No probation or parole on employing a firearm. I mean, I know the ranges of punishments.

I remember we did talk about range of punishments. I couldn't quote the exact words that came out of my mouth though.

Trial counsel reviewed the judgment form in this case, looking carefully at the boxes that were checked "TDOC" and "[W]orkhouse." When asked whether he talked to the Petitioner about where he would serve his sentence, trial counsel replied:

I do remember him saying he wanted to serve his time at the Penal Farm. I remember telling him I can't guarantee where they're going to put him. I told him I will check the box and ask the judge if he would consider executing the sentence for the [W]orkhouse. And I remember the judge saying during the sentencing that he couldn't sentence him to the [W]orkhouse.

Trial counsel acknowledged that when the Petitioner signed the judgment form, the box for "[W]orkhouse" was checked. When asked if the Petitioner understood that they were merely going to request that his sentence be served in the Workhouse, trial counsel responded:

That's what we talked about. Now I told him I couldn't guarantee that he would be at the [W]orkhouse. I told him that I would ask [the trial judge] if that was okay with him, and [the trial judge] then said it wasn't, and he would have an opportunity to change his plea if that was the case. And I believe he went through with the plea anyway[].

Trial counsel said he thought that prior counsel had already provided the Petitioner with discovery in this case by the time he took over; however, he asserted that he "went over discovery with [the Petitioner] the very first day that [he] met with him and had discovery." He stated, "I remember specifically talking to [the Petitioner] about . . . the partial confession that he gave, and why I thought that was a very bad circumstance." Trial counsel said that although the Petitioner had initially said he wanted to go to trial, the Petitioner "chang[ed] his mind" after they discussed the case and the potential sentence he could face if convicted at trial.

On cross-examination, the State asked trial counsel if he ever calculated when his clients might be released on parole, and trial counsel replied that his standard procedure

with clients was to look at the TDOC guidelines regarding release eligibility dates but also inform them that the guidelines were subject to change. He said he routinely informed his clients, "You may not get parole, you may have to flatten it, you may get good and honor credit, you may get in programs and get even more credit than this, but . . . it's between you and TDOC. I—I don't calculate sentences. I can't."

The State and trial counsel then had the following exchange:

Q. So would it be fair to say that you never promise a defendant situated like this one, who may have a 15-year sentence at 30 percent, you'd never promise him you're going to get out of jail in four and a half years?

A. I have never made any such promise in any case, except—unless maybe it was like a—a misdemeanor and his sentence was like ten days, and I could say, you'll be out in ten days.

Q. Something that was determinate?

A. Something that was determinate. But on a felony case with these percentages, I have never guaranteed a release date on anybody.

Q. Okay. And so to be crystal clear, did you ever tell this [Petitioner] that he would be out of jail in four and a half years?

A. No.

Trial counsel asserted that he reviewed the petition for waiver of a trial by jury, which detailed the rights being relinquished, with the Petitioner. When asked if he ever advised his clients, after signing a waiver of trial by jury, to say "yes" to everything the judge said, trial counsel responded, "I never in my career said just say ["]yes["] to everything [the judge] says." When asked if he ever advised the Petitioner to just say "yes" to everything the judge asked during the plea submission hearing, trial counsel replied, "No."

On redirect examination, post-conviction counsel asked how long it would take to review the discovery packet with the Petitioner, and trial counsel responded, "[a] couple of hours maybe" depending on the circumstances. When challenged about whether he really

spent two hours talking to the Petitioner in one of the rooms behind the courtroom, trial counsel replied, "Over multiple court dates, yes. At least two hours."

On November 22, 2019, the post-conviction court entered a written order denying the Petitioner relief. In it, the post-conviction court summarized both the Petitioner's and trial counsel's testimony before finding that a review of the record and the exhibits admitted at the evidentiary hearing, including the Petitioner's judgment sheet and the transcript of the plea submission hearing, "contradict[ed] the [P]etitioner's testimony." Following entry of this order, the Petitioner filed a timely notice of appeal.

## ANALYSIS

**I. Ineffective Assistance of Counsel**. The Petitioner argues that trial counsel provided ineffective assistance of counsel on several different grounds. He asserts that had he been effectively represented, he would have proceeded to trial. The State counters that the post-conviction court properly denied relief. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (citations and internal quotation marks omitted), abrogated on other grounds by Brown v. Jordan, 563 S.W.3d 196, 202 (Tenn. 2018); see Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013); Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn.

2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). To establish prejudice in the context of a guilty plea, a petitioner must show that, but for counsel's errors, the petitioner would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

First, the "Petitioner asserts that [trial] counsel did not properly investigate the case." Initially, we note that the Petitioner provided no argument or references to the record for this issue. Accordingly, this issue is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)). Waiver notwithstanding, the Petitioner is not entitled to relief.

At the post-conviction hearing, the Petitioner testified that he realized that there were "loops . . . inside [his] discovery package" that made him believe he had "a better chance of winning" at trial. The Petitioner explained that one of these "loops" was the defense that the victim misidentified him as the driver during the shooting. Although trial counsel testified that he did not remember whether he did an investigation in this case, he stated that the Petitioner gave a partial confession, wherein he admitted that he was with the other individuals involved in the shooting, and that both the victim and the codefendant's girlfriend placed the Petitioner at the scene. Trial counsel said he informed the Petitioner that the State would argue he was the getaway driver in the "drive-by" shooting, which meant he could be convicted of the charged offenses under the theory of

- 11 -

criminal responsibility. Trial counsel also asserted that after they discussed the facts of the case and the potential sentence he could face if convicted at trial, the Petitioner "change[d] his mind" and decided to enter a guilty plea. While the post-conviction court did not make any specific findings on this issue, it did conclude, and we agree, that the Petitioner "ha[d] not shown by clear and convincing evidence that he received ineffective assistance of counsel[.]" Because the Petitioner has not established that trial counsel was deficient in failing to properly investigate his case, he is not entitled to relief on this ground.

Second, the Petitioner contends trial counsel "never reviewed his discovery with him" and that he "never received any of his discovery until the day of his plea." At the post-conviction hearing, the Petitioner reiterated that trial counsel did not provide him with his discovery packet until April 7, 2014, the day he entered his guilty plea. However, trial counsel testified that he "went over discovery with [the Petitioner] the very first day that [he] met with him and had discovery." Referencing the contents of this discovery, trial counsel stated, "I remember specifically talking to [the Petitioner] about . . . the partial confession that he gave, and why I thought that was a very bad circumstance." Trial counsel also said there were "several photo lineups" and "Facebook photos" that he reviewed with the Petitioner, as well as "three or four statements given by witnesses." Again, we agree with the post-conviction court's conclusion that the Petitioner failed to show by clear and convincing evidence that he received ineffective assistance of counsel. Because the Petitioner has failed to demonstrate that trial counsel was deficient regarding discovery, he is not entitled to relief on this claim.

Third, the Petitioner claims he "received no jail visits from [trial counsel]." The Petitioner has waived this issue for failing to support it with any argument. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). In any case, he is not entitled to relief.

The Petitioner testified that he only met with trial counsel three times, all of which were at his court dates, and that trial counsel never met with him at the jail. Although trial counsel did not recall visiting the Petitioner at the jail, he stated that he did "remember meeting with him in these interview rooms behind the courtroom at length for hours at a time across his various court dates, report dates that we had." He also stated that he met with the Petitioner "in the courtroom lockup." Trial counsel asserted, "Unless there was some special circumstance where I needed to rush down [to the jail to] talk to [the Petitioner], it's just logistically easier to talk to him on his report dates here."

Because the proof at the post-conviction hearing established that trial counsel met with the Petitioner several times, the Petitioner has failed to show that trial counsel was deficient in not meeting with him at the jail. We agree with the State's assertion that "the location of the meeting simply does not matter." Consequently, we also agree with the post-conviction court's conclusion that the Petitioner failed establish that he received

ineffective assistance of counsel. Because the Petitioner has not shown that trial counsel was deficient in failing to meet with him at the jail, he is not entitled to relief.

Fourth, the Petitioner maintains that trial counsel "only talked to him twice." The Petitioner has waived this issue for failing to support it with argument or appropriate references to the record. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Waiver notwithstanding, he is not entitled to relief.

Although the Petitioner alleges in his brief that trial counsel only met with him two times, he admitted at the post-conviction hearing that trial counsel met with him "[t]hree times." The Petitioner said that the first time he met with trial counsel was for "ten minutes, when he came to [him] with the plea deal[,]" the second time was for "two minutes[,]" and the third time, when he signed his plea agreement, was for "15 to 20 minutes at the most." Trial counsel testified that he met with the Petitioner "[a]t least three or four" times. He remembered reviewing discovery with the Petitioner and talking with him about the evidence. He also recalled a meeting where the Petitioner said he wanted to plead guilty to aggravated assault, and he informed him that this was a jury question. Trial counsel said he talked to the Petitioner about how the State would claim that he was the getaway driver, which meant he could be convicted of the charged offenses under a theory of criminal responsibility. In addition, trial counsel said he talked to the Petitioner about his sentence exposure, which exceeded thirty years, and the advantages of entering a guilty plea to attempted first degree murder for the minimum sentence. Although trial counsel admitted he did not remember "the exact number of . . . times [he] met with him," he asserted that he talked to the Petitioner "[o]ver multiple court dates" for "[a]t least two hours."

While the post-conviction court did not make any specific findings of fact on this issue, it did conclude that the Petitioner was not entitled to relief on his ineffective assistance claim. Because the Petitioner has not established that trial counsel was deficient in failing to adequately meet with him, he is not entitled to relief on this issue.

Fifth, the Petitioner contends that "because of the ineffective assistance" of trial counsel, "his guilty plea was not freely and voluntarily given." He asserts that he was only eighteen years old when he entered his guilty plea, had never appeared in criminal court, had been enrolled in resource classes at school, had trouble reading, and did not understand most of the plea proceedings. The Petitioner asserts that "his ignorance and incomprehension of the proceedings was not alleviated by his appointed [trial] counsel[,]" who he claims failed to inform him of his rights, including the right to a speedy trial, the right to subpoena witnesses, and the right to cross-examine witnesses against him, and instructed him to "just say yes to the judge's questions in the plea colloquy."

A plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats[.]'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin v. Alabama, 395 U.S. 238, 242-43 (1969)). In determining whether a guilty plea is voluntarily and intelligently entered, a trial court must look at a number of factors, which include the following:

> 1) the defendant's relative intelligence; 2) the defendant's familiarity with criminal proceedings; 3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; 4) the advice of counsel and the court about the charges and the penalty to be imposed; and 5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial.

Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006) (citing Blankenship, 858 S.W.2d at 904).

Although we will consider, in the next section, the Petitioner's allegation that his guilty plea was involuntary and unknowing because of his youth, his intellectual difficulties, and his inexperience with the justice system, we will now consider the Petitioner's claim that trial counsel's ineffectiveness in failing to inform him of his rights and in instructing him to "just say yes to the judge's questions in the plea colloquy" rendered his plea involuntary and unknowing.

At the post-conviction hearing, the Petitioner insisted that trial counsel never reviewed the petition for waiver of a trial by jury with him before he signed it. He claimed that he did not inform the trial court about trial counsel's failure to review the petition with him "[b]ecause . . . [he] already had signed for the time and [he] was . . . really just ready to get it over with." The Petitioner also asserted that he never understood the rights he was waiving by entering his guilty plea. Although he admitted telling the trial court that he was entering his plea freely and voluntarily, he claimed, "I was young at the time and . . . I thought my lawyer [was acting in my] best interest[s][.]" On cross-examination, the Petitioner admitted that although he claimed trial counsel told him to say "yes" to all the trial court's questions at the plea submission hearing, he actually responded, "No" when the trial court asked him if he had previously entered a guilty plea in a court a law. The Petitioner acknowledged that he did not want to receive a thirty-year sentence and that he had wanted his case concluded at the time he entered his guilty plea.

Trial counsel testified that although the Petitioner had initially wanted to go to trial, he "changed his mind" and decided to plead guilty after they discussed the case and the

- 14 -

potential sentence the Petitioner could face if convicted at trial.  He stated that he reviewed the petition for waiver of a trial by jury, which details the rights being relinquished, with the Petitioner.  Trial counsel declared, "I never in my career said just say ["]yes["] to everything [the judge] says," and when asked if he ever advised the Petitioner to just say "yes" to everything the judge asked during the plea submission hearing, trial counsel replied, "No."

The transcript of the plea submission hearing shows that the Petitioner acknowledged that he signed his petition after reviewing it with trial counsel.  The trial court then conducted a thorough plea colloquy detailing his rights, and the Petitioner acknowledged that he wished to waive his rights in order to accept the State's offer.  When the trial court asked if he was entered his guilty plea "freely and voluntarily," the Petitioner replied, "Yes, sir."

The post-conviction court, in denying relief, found that the transcript of the plea submission hearing "contradict[ed] the petitioner's testimony."  The court then concluded that the Petitioner had not shown by clear and convincing evidence that he received ineffective assistance of counsel or that his guilty plea was unknowingly or involuntarily entered. Because the record fully supports the post-conviction court's finding and conclusion, he is not entitled to relief on this issue.

Sixth, the Petitioner argues that "he was told and that the judgment sheet does show that he was told by [trial] counsel that his sentence would be served in the 'Workhouse' a.k.a. the Shelby County Correction[s] Center."  He claims "he was informed by [trial counsel] that he would serve his time in the Shelby County Correction[s] Center (penal farm) as opposed to TDOC" and that his judgment form "showed him serving his time in the local workhouse" until the trial court amended it after the plea colloquy "to account for a sentence with the TDOC."  The Petitioner claims that he would not have entered his guilty plea if he had understood that he would have to serve his sentence in a TDOC facility. In addition, while not specifically raised in his post-conviction petition, the Petitioner claims that he "was not informed by [trial counsel] that he would not automatically be released upon completion of thirty percent of his sentence."

At the post-conviction hearing, the Petitioner testified that trial counsel told him he was "going to do four and a half years and then [he] was going to go to the [W]orkhouse, which is the penal farm."  The Petitioner referenced his judgment form, which showed that the box for "Workhouse" had been checked and then scratched through and the box for "TDOC" had been checked.  The Petitioner insisted that even after the trial court explained that he would have to mark "TDOC" on the judgment sheet, he still believed he was going to serve his sentence at the Workhouse because the trial court had said "it's up to [the TDOC]."

Trial counsel testified that he informed the Petitioner, prior to the plea submission hearing, that he would "check the box and ask the judge if he would consider executing the sentence for the [W]orkhouse." Trial counsel explained, "I couldn't guarantee that [the Petitioner] would be at the [W]orkhouse. I told him I would ask [the judge] if that was okay with him, and [the judge] then said it wasn't, and he would have an opportunity to change his plea if that was the case." He asserted that his standard procedure with clients was to look at the TDOC guidelines regarding release eligibility but also inform them that the guidelines were subject to change. He made it clear that he could not "calculate sentences." Trial counsel asserted that he had never promised a client that he would be released after service of a specific amount of time and that he had never informed the Petitioner that he would be released after four-and-a-half years.

The plea submission transcript shows that the trial court clearly informed the Petitioner that the judgment form would have to be marked "TDOC" because the Tennessee Department of Correction determined whether he served his sentence at the Workhouse or at a TDOC facility. The Petitioner affirmed that he understood what the trial court had told him and that he still wished to enter his guilty plea.

The post-conviction court, in denying relief, made the following findings: "The [P]etitioner was asked specifically if his plea was contingent on going to the correctional center and he indicated it was not. The Court credits the testimony of [trial counsel] and does not find the [P]etitioner credible." The record does not preponderate against the post-conviction court's findings of fact concerning this issue; consequently, the Petitioner has failed to establish that trial counsel was deficient in advising him that he would serve his sentence at the Workhouse. Moreover, the Petitioner has failed to show that trial counsel was deficient in failing to inform him that he would not automatically be released upon completion of thirty percent of his sentence. Accordingly, the Petitioner is not entitled to relief on these issues.

Seventh, the Petitioner asserts that "he was prejudiced in that he would have proceeded to trial on this matter had he been effectively represented." He also claims that he would not have accepted the "Plea Deal" if he had understood that he would have to serve his sentence in a TDOC facility.

At the post-conviction hearing, the Petitioner testified that even though he entered his guilty plea, he had really wanted to go to trial. However, on cross-examination, the Petitioner admitted that he had not wanted to receive a thirty-year sentence and that he had wanted his case concluded at the time he entered his guilty plea. Trial counsel testified that although the Petitioner had initially wanted to go to trial, the Petitioner decided to plead guilty after they talked about the case and the potential sentence he could face if convicted at trial.

- 16 -

We agree with the post-conviction court's conclusion that the Petitioner failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. Because the Petitioner has failed to establish that he would have proceeded to trial if not for trial counsel's ineffectiveness, the Petitioner is not entitled to relief on this ground.

**II. Involuntary and Unknowing Plea.** The Petitioner also contends that his guilty plea was not knowingly, voluntarily, and intelligently entered. The State counters that the post-conviction court properly determined that the Petitioner had failed to establish that his plea was unknowing or involuntary. We have already concluded that the Petitioner is not entitled to relief from his guilty plea on this basis that trial counsel provided ineffective assistance. However, the Petitioner also claims that he was only eighteen years old when he entered his guilty plea, that he had never appeared in criminal court prior his plea, that he had been enrolled in resource classes at school, that he had trouble reading, and that he did not understand most of the plea proceedings. We will now consider whether any of these circumstances caused the Petitioner to enter an involuntary and unknowing plea.

The validity of a guilty plea is a mixed question of law and fact that is reviewed de novo. Lane, 316 S.W.3d at 562. To enter a guilty plea, an individual must waive his constitutional rights. Bush v. State, 428 S.W.3d 1, 9 (Tenn. 2014). However, in order to be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. Lane, 316 S.W.3d at 562 (citing State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977); North Carolina v. Alford, 400 U.S. 25, 31 (1970); Brady v. United States, 397 U.S. 742, 747 (1970); Boykin, 395 U.S. at 242-44).

When determining whether a guilty plea was knowingly, voluntarily, and intelligently entered, the court must consider "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Lane, 316 S.W.3d at 562 (quoting Grindstaff, 297 S.W.3d at 218). If a guilty plea is not knowingly, voluntarily, and intelligently entered, then the defendant has been denied due process, and the guilty plea is void. Id. (citations omitted).

"[T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Because such statements carry a strong presumption of truthfulness, a petitioner, in order to overcome this presumption, must present more than "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible." Id.

At the post-conviction hearing, the Petitioner testified that he never understood the rights he was waiving by pleading guilty. He claimed that although he told the trial court that he was entering his plea freely and voluntarily, he was "young at the time" and believed trial counsel was acting in his best interests. He also said that when the trial court asked him if he had any questions at the plea submission hearing, he did not know enough to pose any questions. The Petitioner offered no proof that he had been enrolled in resource classes at school, that he had trouble reading, or that he had never appeared in criminal court prior to entering his plea. Trial counsel testified that although the Petitioner had initially wanted to go to trial, he decided to plead guilty after they discussed the case and his potential sentence exposure. Trial counsel also said that he reviewed the petition for waiver of a trial by jury, which detailed the rights being relinquished, with the Petitioner before the Petitioner entered his guilty plea.

In denying relief, the post-conviction court found that the transcript of the plea submission hearing "reveal[ed] no ambiguity on the part of the petitioner about his understanding of his rights or the terms of the guilty plea." The court noted that "[t]he petitioner was asked specifically if his plea was contingent on going to the correctional center and he indicated it was not." The post-conviction court specifically credited trial counsel's testimony and did not find the Petitioner to be credible.

The record does not preponderate against the post-conviction court's findings of fact. The plea submission hearing transcript shows that the Petitioner provided appropriate responses during the detailed plea colloquy, wherein the trial court asked him about his understanding of his constitutional rights, the consequences of entering a guilty plea, and the voluntariness of his plea. The record shows that trial counsel provided competent advice to the Petitioner concerning his charges, his alternatives, and his sentence exposure. It also shows that the Petitioner made a voluntary and sensible decision to enter his guilty plea in order to avoid the possibility of receiving a sentence of more than thirty years if convicted at trial. Because the Petitioner has failed to establish that his plea was unknowing, involuntary, or unintelligent, he is not entitled to relief.

**III.   Plea Withdrawn to Correct Manifest Injustice.**   Lastly, the Petitioner, referencing Tennessee Rule of Criminal Procedure 32(f), inquires "[w]hether [his] plea should be withdrawn to correct manifest injustice." The State responds that because the record does not show that the Petitioner filed a motion to withdraw his guilty plea in the trial court within thirty days of entry of the judgment and because the Petitioner fails to claim that he ever sought to withdraw his plea as contemplated by Tennessee Rule of Criminal Procedure 32(f), he is not entitled to relief. We agree that the Petitioner is not entitled to relief.

Here, the record shows that the Petitioner entered his guilty plea on April 7, 2014, and the judgment form for this conviction was entered the same day. If the Petitioner had desired to withdraw his guilty plea pursuant to Rule 32(f), then he should have filed a motion to withdraw his guilty plea in the trial court. However, the record is devoid of any indication that the Petitioner ever filed a motion to withdraw his guilty plea within thirty days of entry of this judgment of conviction. Moreover, the Petitioner fails to assert in his brief that he ever filed such a motion. Most importantly, we note that post-conviction proceedings are not the appropriate avenue to seek relief from the denial of a Rule 32 motion, had such a motion been filed and denied in this case. See State v. Burris, 40 S.W.3d 520, 524 (Tenn. 2000). Accordingly, the Petitioner is not entitled to relief.

## **CONCLUSION**

The judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE